AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means          ☐ Original     ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized or identify the person<br>by name and address)*<br><br>A 2018 Ford F-150 Raptor pickup truck, California<br>License Plate 34711Y1, Vehicle Identification<br>Number 1FTFW1RG1JFA44151 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 5:20-MJ-00409

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:       Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the seizure of the following person or property located in the Central District of California  *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

I find that the affidavit(s), or any recorded testimony, establish probable cause to seize the person or property described above.

Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for____days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:       8/12/2020 @ 6:17 p.m.                    _____
                                                                                              *Judge's signature*

City and state:       Riverside, CA                                       Hon. Shashi H. Kewalramani, U.S. Magistrate Judge
                                                                                              *Printed name and title*

AUSA: Natasha Haney (213-479-5969)

AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)
(Page 2)

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## AFFIDAVIT

I, Ryan Riggs, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a warrant to seize a 2018 Ford F-150 Raptor pickup truck, California License Plate 34711Y1, Vehicle Identification Number 1FTFW1RG1JFA44151, registered to Yareli Cornejo Guzman and Sarai Chiquito Mendia, described in Attachment A, which is incorporated herein by reference.

2.   The item to be seized constitutes evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841 (possession with intent to distribute controlled substances and distribution of controlled substances) and 846 (conspiracy to possess with intent to distribute controlled substances and to distribute controlled substances).

3.   The facts set forth in this affidavit are based on my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.   **BACKGROUND ON AFFIANT**

4.    I am a Law Enforcement Officer ("LEO") with the United
States Forest Service ("USFS") and have been so employed since
August 2012.  I attended the Department of Homeland Security
Federal Law Enforcement Training Center and completed the Land
Management Police Training Program in January 2013.  I completed
the United States Forest Service Title 21 Drug Enforcement
Training Program in May 2013.  I am currently crossed-designated
by the Drug Enforcement Administration ("DEA") to conduct Title
21 law enforcement activities.  I am a United States Forest
Service designated Field Training Officer, responsible for
training basic law enforcement officers.  I obtained a Bachelor
of Science Degree in Criminal Justice Administration with a
Concentration in Management in 2016.

5.    I have been the lead investigator on two marijuana
cultivation investigations.  I have participated in
approximately ten or more marijuana cultivation raid operations,
and I have participated in approximately 30 or more marijuana
cultivation eradication, evidence collection, and disposal
operations.

## III. **STATEMENT OF PROBABLE CAUSE**

6.    On August 7, 2020, the Honorable Sheri Pym, United
States Magistrate Judge, signed warrants in case numbers 5:20-
MJ-00405 and 5:20-MJ-00406 authorizing searches of two parcels
of land (designated as "SUBJECT PREMISES 1" and "SUBJECT PREMISE
2," respectively) associated with a marijuana cultivation
operation I am investigating.  The affidavit I submitted in

support of those warrants is incorporated by reference herein and attached as Exhibit 1.

7.   On August 12, 2020, I, along with other law enforcement agents, executed the above-referenced warrants at SUBJECT PREMISES 1 and SUBJECT PREMISE 2.

8.   While executing the warrant at SUBJECT PREMISE 2, law enforcement discovered a 2018 Ford Raptor pickup truck, California License Plate 34711Y1, Vehicle Identification Number 1FTFW1RG1JFA44151 (the "Ford Raptor"), registered to Yarelia Cornejo Guzman and Sarai Chiquito Mendia.  The Ford Raptor was parked at the back of the SUBJECT PREMISE 2 parcel, behind the mobile/manufactured structure described in Exhibit 1 as "28405 LONGS."

9.   Law enforcement recognized the Ford Raptor because it had previously been observed on surveillance cameras at the highway drop point (further described in Exhibit 1), near the Cleveland National Forest marijuana grow site identified in this investigation.  Specifically, the highway drop point camera captured photographs on August 7, 2020, at approximately 8:48 p.m. through 8:51 p.m. showing the Ford Raptor pull into the highway drop point turnout.  Movement (person(s) walking from the driver's side to the passenger side and back) around the vehicle was photographed just before the vehicle left the area. The trail camera captured photographs on this same date (August 7, 2020) at approximately 8:43 p.m. that depicted two or three male subjects walking along the identified trail from the cultivation site toward the highway drop point.  One of the

subjects appeared to be carrying a large filled bag out of the cultivation site.  The bag was the approximate size of a large filled black trash bag.  The subjects returned at 8:51 p.m. walking back toward the cultivation site, now carrying different bags/items (supplies in boxes and/or large bags).  As described further in Exhibit 1, based on my training and experience, this activity is consistent with the Ford Raptor being used to resupply the grow site and transport harvested marijuana product from the grow site.

10.  While executing the search warrants on August 12, 2020, agents searched the Ford Raptor.  Inside the cab of the Ford Raptor, law enforcement found approximately one pound of packaged, processed marijuana, as well as remnants of processed marijuana in the bed of the Ford Raptor.  Law enforcement found the title to the Ford Raptor inside the 28405 LONGS structure on SUBJECT PREMISE 2.  The title to the Ford Raptor was in the name of FRANCISCO SANCHEZ-MARTINEZ, who, as discussed in Exhibit 1, is a target of this investigation.  When agents arrived at SUBJECT PREMISE 2 to execute the search warrant, SANCHEZ-MARTINEZ was observed coming out of the 28405 LONGS structure.  Inside the 28405 LONGS structure, agents found multiple bags of processed, packaged marijuana; thousands of dollars in cash; a bulletproof vest; and multiple wire transfer money receipts.

## IV.  **CONCLUSION**

11.  For all the reasons described above, there is probable cause to believe that the Ford Raptor constitutes evidence, fruits, and instrumentalities of the 21 U.S.C. §§ 841

(possession with intent to distribute controlled substances and distribution of controlled substances) and 846 (conspiracy to possess with intent to distribute controlled substances and to distribute controlled substances ).

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  12th day of
August, 2020.

UNITED STATES MAGISTRATE JUDGE
SHASHI H. KEWALRAMANI

## <u>ATTACHMENT A</u>

The item to be seized is described as a 2018 Ford F-150 Raptor pickup truck, California License Plate 34711Y1, Vehicle Identification Number 1FTFW1RG1JFA44151, registered to Yareli Cornejo Guzman and Sarai Chiquito Mendia.



Exhibit 1

Case 5:20-mj-00406-DUTY Document 3 Filed 08/13/20 Page 10 of 59 Page ID #:127
Case 5:20-mj-00406-DUTY Document 1 (Ex Parte) *SEALED* Filed 08/07/20 Page 1 of 50
Page ID #:91

# UNITED STATES DISTRICT COURT

for the

Central District of California

<table>
<tr><td>In the Matter of the Search of<br><br><i>(Briefly describe the property to be searched or identify the person by name and address)</i><br><br>23775 Pico Road<br>Nuevo, CA 92567</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No. 5:MJ-20-00406</td></tr>
</table>

FILED
CLERK, U.S. DISTRICT COURT

August 7, 2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KC _____ DEPUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841; and 846 | See attached affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
_____
*Applicant's signature*

Law Enforcement Officer, Ryan Riggs
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: August 7, 2020
_____

_____
*Judge's signature*

City and state: Riverside, CA
_____

Hon. Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA: Eli A. Alcaraz (213-453-8995)

**AFFIDAVIT**

I, Ryan Riggs, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a search warrant for 24911 Fir Street, Menifee, California 92584 ("SUBJECT PREMISE 1") described in Attachment A-1, which is incorporated herein by reference, for the items to be seized described in Attachment B.

2.    This affidavit is further made in support of a search warrant for 23775 Pico Road, Nuevo, California 92567 ("SUBJECT PREMISE 2") (collectively, the "SUBJECT PREMISES") described in Attachment A-2, which is incorporated herein by reference, for the items to be seized described in Attachment B.

3.    The items to be seized are the evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841 (possession with intent to distribute controlled substances and distribution of controlled substances) and 846 (conspiracy to possess with intent to distribute controlled substances and to distribute controlled substances ) (the "SUBJECT OFFENSES"), as described in Attachment B, which is incorporated herein by reference.

4.    The facts set forth in this affidavit are based on my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation

1

Case 5:20-mj-00400-DUTY Document 2 Filed 08/12/20 Page 12 of 59 Page ID #:128
Case 5:20-mj-00400-DUTY *SEALED* Document 3 *SEALED* Filed 08/07/20 Page 13 of 50
Page ID #:93

into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  BACKGROUND ON AFFIANT

5.    I am a Law Enforcement Officer ("LEO") with the United States Forest Service ("USFS") and have been so employed since August 2012.  I attended the Department of Homeland Security Federal Law Enforcement Training Center and completed the Land Management Police Training Program in January 2013.  I completed the United States Forest Service Title 21 Drug Enforcement Training Program in May 2013.  I am currently crossed-designated by the Drug Enforcement Administration ("DEA") to conduct Title 21 law enforcement activities.  I am a United States Forest Service designated Field Training Officer, responsible for training basic law enforcement officers.  I obtained a Bachelor of Science Degree in Criminal Justice Administration with a Concentration in Management in 2016.

6.    I have been the lead investigator on two marijuana cultivation investigations.  I have participated in approximately ten or more marijuana cultivation raid operations, and I have participated in approximately 30 or more marijuana cultivation eradication, evidence collection, and disposal operations.

## III. TRAINING AND EXPERIENCE REGARDING MARIJUANA CULTIVATION AND DRUG TRAFFICKING

7.    Based upon my training, experience, interviews, and participation in outdoor marijuana cultivation investigations, I

2

have become knowledgeable regarding the many tactics employed by drug traffickers to manufacture, transport, distribute, and conceal marijuana.

8.   As a result of my training and experience, I am familiar with the methods by which marijuana is used and the typical manufacturing, distribution and trafficking methods used by marijuana cultivators and traffickers.

9.   I know that marijuana traffickers often cultivate marijuana on public lands throughout the country, including in the Central District of California.

10.  Based on my training, experience, my discussions with experienced narcotics investigators, and through the information that I have learned through these investigations, I know that most outdoor live-in marijuana cultivations, in general, operate in a similar manner, as follows.

     a.   Outdoor marijuana cultivations, involving a large number of marijuana plants, require substantial labor to tend to the plants, provide logistical support for the labor force tending to the plants, and provide financial support until proceeds from the processed marijuana are received.

          i.   Leader: Typically, one person is identified as the leader of the organization.  This person is responsible for directing the operation and ensuring that all logistical support is provided, as needed.  In many instances, the organization's leader is in communications with the workers in the outdoor marijuana cultivation sites, the purchasers of the supplies, and the resupply vehicle drivers.  In most instances,

3

Case 5:20-mj-00409-DUTY  Document 2  Filed 08/13/20  Page 14 of 59  Page ID #:131
Case 5:20-mj-00409-DUTY *SEALED*  Document 3 *SEALED*  Filed 08/07/20  Page 13 of 50
Page ID #:95

the leader of the organization is also the largest local benefactor of the proceeds from the sale of the controlled substances.

      ii.  Supply Purchasers: People within the organization are identified to make necessary purchases of goods, including food, supplies, and equipment, for the marijuana cultivation operation.  In most instances, the supply purchasers make purchases based on the direction of the organization's leader.

      iii. Drivers: Drivers are people that make the actual delivery of food, supplies, equipment and people to the designated drop point, as well as pick up people and processed marijuana from the drop points for delivery to the organization's distribution structure.

      iv.  Grow Workers: These are the people that are physically in the cultivation sites that tend to the marijuana plants, harvest the marijuana buds, process the marijuana, and/or provide on-site logistical support for other workers, such as cook meals.

      b.  Outdoor marijuana cultivation organizations start exploring and scouting potential cultivation sites in the late winter and early spring.  These organizations are normally in search of areas in which the snow melts comparatively early, in proximity to a viable water supply and sufficiently isolated to avoid encounters with legitimate users of the area, such as recreationalists and permitted businesses.  Most outdoor marijuana cultivation organizations try to plant marijuana

plants as early as possible in order to harvest the plants as
early as possible and potentially tend a second crop for the
year before it gets too cold in the late fall and early winter.
Additionally, during scouting excursions, these organizations
attempt to identify drop points that could be used for the
delivery of supplies, equipment and people, which are in close
proximity to the cultivators' unsanctioned/unofficial trail
system and/or cultivation sites. A drop point is a designated
location where the drivers can deliver supplies and workers for
the cultivation sites, and the drivers can pick up processed
marijuana and grow workers leaving from the cultivation sites.
Drop points are typically situated near the
unsanctioned/unofficial trail system, so that the grow workers
can carry the delivered supplies to the camp area and the
processed marijuana to the drop point on foot. Thus, it is
common to find a distinct, but unsanctioned, trail system near
the drop points. The creation, use and maintenance of these
unsanctioned/unofficial trail systems creates impacts to the
natural resources in the area, to include but not limited to
increased erosion, introduction of invasive plant species and
the lessening of local native plant species, and negative
impacts to the area's watershed(s). In many instances, these
organizations tend to favor drop points in remote areas where
law enforcement resources and legitimate traffic is scarce to
avoid detection.

      c.   Once an outdoor marijuana cultivation
organization identifies potential cultivation sites, the

Case 5:20-mj-00400-DUTY Document 2 Filed 08/13/20 Page 16 of 59 Page ID #:133
Case 5:20-mj-00400-DUTY SEALED Document 3 SEALED Filed 08/07/20 Page 17 of 50
Page ID #:97

organization engages in making purchases of necessary supplies
to prepare the land and to establish means to water the
anticipated cultivation area.  In many instances, fertilizers,
herbicides, pesticides, and irrigation equipment will be
obtained from various retail and wholesale sources, as well as
illegitimate sources, such as through smuggling goods into the
United States.

      d.  As equipment and supplies for the outdoor
marijuana cultivation are procured, the outdoor marijuana
cultivation organization begins to deliver these items to the
area of the identified marijuana cultivation sites.  In most
instances, these items are delivered to the identified drop
points.

      e.  The land is then prepared for planting of the
marijuana plants.  The irrigations system, including the
potential construction of water storage reservoirs and/or
tapping into known water supply sources, are laid to the
cultivation sites.  Native vegetation, including trees, shrubs,
and other plants, are thinned, removed or otherwise damaged, to
make room for the marijuana plants.  Camp locations, where the
workers will be living, are prepared.

      f.  After the land has been prepared for planting,
the marijuana plants are placed into the ground.  For
cultivation sites that use live-in workers, camps are developed,
and the live-in workers establish unlawful residency, in the
cultivation areas.

g.    Throughout the growing season, which lasts approximately three to six months, various supplies, equipment and food are purchased by the supply purchasers, usually at the direction and financial support of the organization leader.  As necessary items are procured, drivers will make periodic deliveries to the designated drop point, including the drop-off of new workers and the picking-up of workers from the cultivation sites.

h.    As the marijuana plants mature, additional workers arrive at the cultivation sites to help with the labor intensive harvesting and processing of the marijuana buds.  The harvested marijuana is laid-out to dry in processing areas within the cultivation sites and, as it becomes sufficiently dried, it is then packaged and moved to the drop point for pick up by the drivers for delivery to the distribution hubs or to the organization's leadership.

i.    Outdoor marijuana cultivation organizations often rely on the use of cellular telephone technologies, including voice communication, text messaging, multimedia messaging (both photographic and video), social media websites and/or applications (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), and geo-location applications, in furtherance of marijuana cultivation schemes.  It is common for cellular telephones to be used to communicate among the co-conspirators, to include distributors, purchasers, organizational leadership, drivers, grow workers and others. Common communications include the coordination of supply

Case 3:20-mj-00409-DUTY Document 2 Filed 08/12/20 Page 18 of 59 Page ID #:135
Case 5:20-mj-00409-DUTY *SEALED* Document 3 *SEALED* Filed 08/07/20 Page 18 of 50
Page ID #:99

deliveries, and distribution activities, the monitoring by
organizational leadership of the progress of the growing
marijuana, and the management of the change-out of the grow
workers.  Although cellular telephone coverage in many remote
areas where outdoor marijuana cultivations exists are
unreliable, with the advent of new technologies and added
cellular sites have increased cellular coverage into more remote
areas and the use of cellular technologies in the furtherance of
marijuana cultivations has become more common.  Where cellular
coverage remains unreliable, in many instances the grow workers
and the outdoor marijuana cultivation organization use pre-
designated check-in times, where grow workers walk to areas
where there is better cellular coverage to conduct the cellular
telephone calls or send and receive communications using one of
the many ever evolving cellular communication methods.

      j.   After an outdoor marijuana cultivation
organization harvests their last crop of the year, the
cultivation site is abandoned, leaving behind various hazardous
chemicals that were used, such as pesticides, herbicides, and
fertilizers, along with other trash, such as discarded propane
tanks, food items, sleeping bags, and personal hygiene items.
The chemicals and trash left behind often times attract
wildlife, such as bear and deer, which attempt to eat the
abandoned items and, during the search for food, spread the
trash throughout the camp and adjoining areas.  As a result, the
damage to native plant life, animal life, and the land, along
with the hazards posed to the local area, such as ground water

and creeks, leave lasting environmental impacts that require land reclamation actions to mitigate the harm.

11. Based on my training, experience, my discussions with experienced narcotics investigators, and through the information that I have learned through these investigations, I know that marijuana cultivators and other narcotics traffickers frequently use electronic media, to include cellular telephones, digital cameras, and computers and external hard drives in the commission of narcotics related crimes.

12. Narcotics traffickers often use cellular telephones to communicate with co-conspirators to coordinate the shipment of narcotics and to arrange pick up and drop off locations. I know that the date, time, duration, and number dialed of telephone calls between co-conspirators can be obtained through cellular telephone records. Narcotics traffickers often use computers and external electronic storage media such as external hard drives, thumb drives, compact discs and various other types of electronic storage methods. Marijuana cultivators often take photographs of their cultivation sites to memorialize and glorify their accomplishments, document the quality of their product for sale to others to share with managers, workers, and prospective purchasers. Photographs may be taken with either cellular "smart phones" or digital cameras to facilitate the electronic transmission of information to interested parties.

13. These various forms of electronic media are used to orchestrate drug transactions between conspirators, communicate with other narcotics traffickers and sources of supply, maintain

drug proceeds ledgers, drug shipment and storage information, photographs of narcotics and proceeds from narcotics sales as well as other financial information such as records of banking transactions, account balances and funds transfers.

14. Individuals who deal in illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the importation, manufacture, transportation, ordering, sale and distribution of illegal controlled substances. These books, records, receipts, notes, ledgers, bank records, money orders, etc., are maintained where the dealers have ready access to them, such as in secure locations within their residence, the residences of friends and associates, in the places of operation of the drug distribution activity, such as a stash house or safe house, or in a business location with which the trafficker is associated.

15. Individuals who deal in illegal controlled substances routinely conceal in their residence or the residences of friends or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house, large quantities of currency, financial instruments, precious metals, jewelry and other items of value, typically proceeds of illegal controlled substance transactions, financial instruments, including stocks and bonds.

16. It is common for individuals who deal in the sale of and distribution of illegal controlled substances to hide contraband related to the activity, such as scales, packaging materials, and containers, at their residences, or the

residences of their friends or associates, in their business locations or in the places of operation of the drug distribution activity, such as a stash house or safe house.

17. Individuals who deal in the sale and distribution of controlled substances commonly maintain addresses and telephone number books or papers, which reflect names, addresses and or telephone numbers for their associates and their illegal organization. These individuals often use cellular telephones, pagers and telephone systems to maintain contact with their associates in their illegal businesses. These telephone records, bills and pager numbers are often found in their place of residence, or in the residences of their friends or associates, in their business locations, or in their places of drug distribution activity, such as a stash house or safe house.

18. Individuals who deal in illegal controlled substances often take photographs of themselves, their associates, and their property and illegal contraband. These photos are usually maintained in their residence, or the residences of their friends or associates, in their business locations, or in the places of operation of their drug distribution activity, such as a stash house or safe house.

19. Individuals who deal in illegal controlled substances often keep and maintain in their possession firearms and or firearm related materials. These items are usually maintained in their residence, or residences of their friends or associates, in their business locations, or in the places of

operation of their drug distribution activity, such as a stash house or safe house.

## IV.  SUMMARY OF PROBABLE CAUSE

20.  Based on the facts set forth in this affidavit, derived through an investigation in which I have participated, I submit that there is probable cause to believe that FRANCISCO SANCHEZ-MARTINEZ ("SANCHEZ-MARTINEZ") and numerous others have committed the SUBJECT OFFENSES.

21.  During the course of this investigation, law enforcement officers in Riverside County and San Bernardino County have concluded that SANCHEZ-MARTINEZ and his associates are unlawfully cultivating marijuana on public lands in the San Bernardino and Cleveland National Forests.  SANCHEZ-MARTINEZ facilitates resupply efforts at illegal cultivation sites, transports personnel/cultivators/associates, and conducts or is directly involved in the trafficking of controlled substances cultivated on public lands to other sources of supply that remain unidentified.

22.  The SUBJECT PREMISES are locations at where SANCHEZ-MARTINEZ, along with known and unknown co-conspirators, are believed to store drugs, firearms, money, and/or other items used in the furtherance of drug distribution.

23.  SANCHEZ-MARTINEZ lists the SUBJECT PREMISE 1 as his address of record with the California Department of Motor Vehicles as recently as August 6, 2020.  Further, SANCHEZ-MARTINEZ frequently visits the SUBJECT PREMISE 1 and has done so

as recently as July 13, 2020 at 5:21 p.m.  Concerning the
SUBJECT PREMISE 2, SANCHEZ-MARTINEZ appears to reside there.

## V.    STATEMENT OF PROBABLE CAUSE

### A.    Initial Investigation of Cultivation Sites in 2018-2019

24.    In September 2018, a USFS LEO and California
Department of Fish and Wildlife Warden conducted helicopter
reconnaissance in the Cleveland National Forest.  They relayed
information regarding an illegal marijuana cultivation site they
located on public lands within the Central District of
California, Cleveland National Forest, Riverside County, after
they saw marijuana plants from their helicopter.

25.    On October 30, 2018, USFS Special Agent Patrick Brown,
USFS LEO James Jeleniowski, and I conducted ground
reconnaissance of the reported cultivation site and surrounding
area.  We followed a user-created trail that is undeveloped and
not maintained or inventoried by the USFS.  The trail led us
from a highway entrance and suspected cultivation site resupply
drop point directly to the cultivation site.  The trail did not
have an outlet or additional route intersections, and there was
no physical evidence suggesting that the trail was used for
anything other than an ingress and egress route for the
marijuana cultivation site.  At the cultivation site, we saw
physical evidence associated with an illicit marijuana
cultivation site/drug trafficking operation.  For example, we
saw sophisticated irrigation systems, thousands of plant plots
in rows, plant stems with recent cut marks from harvesting

activities, processed marijuana drying stations, processed marijuana trimming stations with piles of dried marijuana stems/branches, camping supplies, fertilizers, gardening tools, a concealed water reservoir, a large amount of trash/debris from long term occupancy, clothing, an air rifle, hammocks, food and food waste, cooking utensils, and general outdoor survival supplies.  Based on my training and experience, the presence of all of these items is consistent with a marijuana cultivation site.

26.  Based on the terrain in the area, the identified entry/resupply drop point for the grow was suspected to be immediately adjacent to a south shoulder turnout along State Route 74/Ortega Highway, approximately 1.25 miles east of the Riverside County and Orange County property boundary (between California State Route 74 posted Mile Markers 1 and 1.5 in Riverside County).  Other than the access trail to the marijuana grow site, there are no other developments in this area of the turnout, e.g., picnic tables, restrooms, other hiking trails, etc.

27.  On June 3, 2019, anticipating that subjects may have returned to the grow for the 2019 growing season, USFS LEO Matthew Ryan and I returned to the trail leading to the identified grow site and placed a surveillance camera in the area of the only identified entrance and exit to the cultivation site and near the suspected resupply drop point (the "trail camera").

28. On June 26, 2019, Agent Brown and I serviced the trail camera, and the data card had photographs that were taken on three separate occasions that captured approximately three individuals walking out of the cultivation site area. The trail camera then captured the individuals carrying supplies from the highway resupply point adjacent to the highway and back toward the direction of the identified cultivation site. It appeared that the individuals were initially walking to the turnout and then carrying the items back toward the grow site only a short distance (less than one minute walking distance away) down the trail before returning for additional supplies (bags, boxes, and buckets). As far as could be determined, these were the first three documented visits by subjects at this cultivation site.

29. The individuals seen on the surveillance camera appear to be Hispanic male adults. They were wearing a combination of camouflage shirts and pants, and other similarly colored clothing. Photographs captured on June 12, 2019 show one of the individuals (a Hispanic male adult wearing a light colored t-shirt and backwards hat) carrying supplies toward the grow site with what appeared to be a semi-automatic handgun visibly protruding from his right front pant pocket.

30. After reviewing the photographs, on June 26, 2019, Agent Brown and I installed a camera near the suspected highway drop point (the "highway drop point camera").

31. During the continued course of surveillance efforts, investigators identified vehicles conducting resupply efforts, subject drop-off or pick-up, and or product pick-up to and from

15

the cultivation site. From July 2019 through December 2019, following probable cause determinations, investigators obtained court approval to place tracking devices on several of these vehicles.

32. In 2019, the following vehicles (the "2019 TARGET VEHICLES") were tracked via tracking devices and identified on one or more occasions in what appears to be participation in the SUBJECT OFFENSES:

a. a white 2011 Ford Explorer, California license plate 6RPN571, Vehicle Identification Number 1FMHK7F80BGA65665 (the "Target Explorer"), registered to SANCHEZ-MARTINEZ, 24911 Fir Street, Menifee, California 92584 (SUBJECT PREMISE 1)[1];

b. a red 2006 Ford F-150, California License Plate 59234P2, Vehicle Identification Number 1FTPW14506FA55868 (the "Target F-150"), registered to Mariano Arreola Botello;

c. a 2017 Toyota Tundra, California License Plate 15590V2, Vehicle Identification Number 5TFDY5F1XHX670522 (the "Target Tundra"), registered to SANCHEZ-MARTINEZ at 24911 Fir Street, Menifee, California 92584 (SUBJECT PREMISE 1);

d. a 2011 Acura TL, California License Plate 8LVA788, Vehicle Identification Number 19UUA8F56BA001166 (the "Target TL"), registered to Salto Daniel Hernandez, 24911 Fir Street, Menifee, California 92584 (SUBJECT PREMISE 1);

---

[1] The registration information provided herein for the 2019 TARGET VEHICLES is the information obtained by investigators in 2019 while the vehicles were active at the cultivation site. The registration information for some of the vehicles may have changed in the year since they were active in the marijuana cultivation operation.

  e. a black Acura TL sedan, California License Plate 8LVL561, Vehicle Identification Number 19UUA8F57AA013177 (the "Target Acura"), registered to Misael Sanchez, 24911 Fir Street, Menifee, California 92584 (SUBJECT PREMISE 1);

  f. a black Hyundai sedan, displaying an immediately apparent and descriptive auto sales advertisement plate for "Americar Auto Finance 21085 Box Springs Road, Moreno Valley, California 92557" (the "Target Hyundai"); and

  g. a blue 2000 Chevrolet Van/Utility Vehicle, California License Plate 5NVN174, Vehicle Identification Number 1GCGG29R6Y1236486 (the "Target Van"), registered to Maria Penaloza and a release of liability entered on file as of September 12, 2019 to a Jose Martinez.

33. As said above, four of the TARGET VEHICLES shared the same registered address at 24911 Fir Street, Menifee, California 92584 (SUBJECT PREMISE 1), which is SANCHEZ-MARTINEZ's address of record with the California DMV.

34. From June 2019 through December 2019, investigators documented 18 instances in which one or more of the 2019 TARGET VEHICLES arrived in and around the highway resupply point and the identified trail leading to and from the cultivation site located on the Cleveland National Forest along Ortega Highway. Further, there was one documented occurrence of the Target Explorer at another suspected marijuana cultivation site located within the San Bernardino National Forest that had recently been identified by USFS aviation reconnaissance.

35.    In 14 of these total 18 instances of the 2019 TARGET VEHICLES in and around the Cleveland National Forest grow site, images from the surveillance cameras placed in the area depict individuals carrying what appear to be trash bags and/or duffle bags out of the cultivation site.  The individuals are seen walking these bags out of the cultivation site and then returning without the bags and/or with different items in their possession.  This shows a tradeoff between the highway resupply point vehicle operator and the cultivator subjects.  In my training and experience, I believe this is indicative of the individuals harvesting, processing, and trafficking the controlled substance that they are manufacturing in the cultivation site.  In my training and experience, I believe this is also indicative of the trafficking organization dropping off supplies and other items to sustain the workers located at the cultivation site.

36.    On October 18, 2019, after confirming that the cultivation site within the Cleveland National Forest had been vacated, Agent Brown and I removed the surveillance cameras.

37.    On October 20, 2019, Agent Brown and I conducted ground reconnaissance of the cultivation site and surrounding area.  We followed the user created trail that is undeveloped and not maintained or inventoried by the USFS.  The trail was still a single lane trail with a width measuring approximately 12 inches and a length of approximately 0.17 miles.  The trail led us from the highway resupply point, directly to the described cultivation site.  The trail did not have an outlet or

additional route intersections, and there was no physical evidence suggesting that the trail was used for any other purpose than the ingress and egress route for the marijuana cultivation site. In other words, there was one entrance and one exit. We found the cultivation site vacant and with physical evidence associated with an illicit marijuana cultivation site/drug trafficking operation infrastructure still present.

38. The cultivation site had been expanded since the prior year. Physical evidence included sophisticated irrigation systems, thousands of plant plots in rows, plant stems with recent cut marks from harvesting activities, processed marijuana drying stations, processed marijuana trimming stations with piles of dried marijuana stems/branches, small marijuana starter plants in pots, camping supplies, fertilizers, gardening tools, a concealed water reservoir, a large amount of trash/debris from long term occupancy, clothing, an air rifle, hammocks, food and food waste, cooking utensils, general outdoor survival supplies, and a significant amount of natural resource damage, to include tree, shrub, and bush removal, area clearings and unauthorized land improvements, and trail construction. In my training and experience, all of these things are consistent with a marijuana grow.

**B.   Re-activation of Cultivation Sites in Spring 2020**

39. On March 26, 2020, at approximately 2:46 p.m., anticipating that the Cleveland National Forest grow site might be used again by subjects in the 2020 grow season, Agent Brown,

LEO Gonzalo Ochoa, and I reinstalled the highway drop point camera and the trail camera in similar locations as the previous year.

40. On April 21, 2020 at approximately 9:51 a.m., Agent Brown, LEO Ochoa, and I serviced both surveillance cameras. The trail camera data card showed photographs captured on April 17, 2020 of two individuals walking out of the cultivation area. The trail camera then photographed the individuals carrying supplies, including potted plants suspected to be marijuana starter plants, from the highway resupply point adjacent to the highway and back toward the direction of the identified cultivation site. This documented occurrence confirmed the cultivation site was active again.

41. Based on continued surveillance, investigators identified additional vehicles conducting resupply efforts, suspect drop-off or pick-up, and/or product pick-up to and or from the cultivation site. From April 2020 through August 2020, following a determination of probable cause, investigators obtained court approval to place tracking devices on several of these vehicles.

42. In 2020, the following vehicles (the "2020 TARGET VEHICLES") were tracked via a tracking device and/or identified on one or more occasions in what appears to be participation in the SUBJECT OFFENSES:

a. a 2016 Toyota pickup truck, California License Plate 48909X2, Vehicle Identification Number 5TFHY5F18GX530291 (the "Target Toyota 48909X2"), registered to SANCHEZ-MARTINEZ,

24911 Fir Street, Menifee, California 92584 (SUBJECT PREMISE 1); and

   b. a 2019 Dodge Ram pickup truck, California License Plate 52684S2, Vehicle Identification Number 1C6RREFT0KN730015, registered to Miguel Garcia Jimenez (the "Target Dodge 52684S2")[2].

  43. Investigators also identified the following vehicle as being involved in cultivation activity, based on its frequent appearances at the highway drop point, although this vehicle was not tracked with a tracking device: a 2006 Toyota 4-Runner 6GDW741, California License Plate 6GDW741, Vehicle Identification Number JTEBU17R368063378, registered to Efrain Lopez.

  44. From April 2020 through August 2020, investigators documented 13 instances in which one or more of the 2020 TARGET VEHICLES and/or the Toyota 4-Runner arrived at or near the highway resupply point and the identified trail leading to and from the cultivation site located on the Cleveland National Forest along Ortega Highway, and one instances at the

---

[2] The Target Dodge 52684S2 is believed to be the vehicle that is currently being used most frequently by SANCHEZ-MARTINEZ for both resupply efforts concerning the cultivation sites and other travel. On May 18, 2020, LEO Ochoa and I observed SANCHEZ-MARTINEZ enter the Target Dodge 52684S2, alone, and drive it to and from two distinct locations (e.g., Perris Swap Meet and Bundy Canyon Shell Station). The tracking device also logged these travel. On May 26, 2020, LEO Ochoa, LEO Pacheco, and I followed the Target Dodge 52684S2 to the outlet mall located at 17600 Collier Avenue, Lake Elsinore, California 92530. We saw SANCHEZ-MARTINEZ park and exit the car. He was not accompanied by anyone else.

cultivation site located on the San Bernardino National Forest, which also appeared to have been re-activated.

45. One time, on May 15, 2020, SANCHEZ-MARTINEZ[3] and an unidentified male were photographed clearly by the cameras arriving at the highway drop point in the Target Dodge 52684S2, carrying supplies, suspected to be 18-packs of alcoholic beverage containers, toward the trail leading to the cultivation site. Approximately four hours later, SANCHEZ-MARTINEZ and the other unidentified male walked back out of the trail leading from the cultivation sight and toward the highway drop point before apparently being picked back up by the Target Dodge 52684S2.

46. SANCHEZ-MARTINEZ and this same unidentified individual were again photographed by the surveillance cameras on June 16, 2020, walking into and out of the trail to the cultivation site.

47. In two of the 14 instances that the 2020 TARGET VEHICLES were at and around the Cleveland and San Bernardino National Forest grow sites, images from the surveillance cameras show subjects carrying what appear to be trash bags and/or duffle bags out of the cultivation site. Subjects are seen walking these bags out of the cultivation site and then returning without the bags and/or different items in their possession. This indicates that a tradeoff took place between the highway resupply point vehicle operator and the cultivator

---

[3] Law enforcement identified this individual as SANCHEZ-MARTINEZ here and in future sightings by comparing his appearance with his photo California DMV photograph.

subjects.  In my training and experience, I believe this is indicative of the subjects harvesting, processing, and trafficking the controlled substance that they are manufacturing in the cultivation site.  In my training and experience, I believe this is also indicative of the trafficking organization dropping off supplies and other items to sustain the workers located at the cultivation site.

48.  In the 2020 grow cycle, July 5, 2020 was the first documented instance of subjects carrying bags suspected to contain harvested marijuana product out of the Cleveland National Forest cultivation site.  The highway drop point camera data card had photographs captured on July 5, 2020 at approximately 8:42 p.m., showing the Target Toyota 48909X2 pull into the turnout, followed by excessive movement around the vehicle just before it left the area.  The trail camera data card showed photographs on the same day at approximately 8:34 p.m. depicting clearly two male subjects walking along the identified trail from the cultivation site toward the highway drop point.  One of the subjects is seen carrying a bag on his back.  The bag was approximately the size of a large backpack. The two subjects then returned at 8:44 p.m. walking back toward the cultivation site now carrying boxes and large bags.

49.  On July 10, 2020, at approximately 12:08 p.m., California Department of Fish and Wildlife Wardens Garber and Baquirin conducted an aviation reconnaissance of the cultivation site on board an airplane.  During this reconnaissance they saw

marijuana plants that appeared to be large, healthy, and ready for harvesting.

    50.   In the 2020 grow cycle, July 27, 2020 was the second documented instance of subjects carrying bags suspected to contain harvested marijuana product out of the Cleveland National Forest cultivation site.   The highway drop point camera data card had photographs from July 27, 2020 at 8:21 p.m. through 8:27 p.m., showing the Target Dodge 52684S2 pull into the highway drop point turnout.   There was excessive movement (persons walking from the driver's side to the passenger side and back) around the car just before it left the area.   The trail camera data card had photographs captured on the same day at approximately 8:12 p.m. depicting clearly two male subjects walking along the identified trail from the cultivation site toward the highway drop point.   One of the subjects is seen carrying a large bag.   The bag was approximately the size of large trash bag.   The two subjects return with an additional male subject at approximately 8:26 pm.   All three subjects were photographed walking back and forth along the trail between 8:26 p.m. and 8:28 p.m. retrieving and carrying boxes, containers, and bags to the cultivation site.   In my training and experience, I believe this is indicative of the subjects harvesting, processing, and trafficking the controlled substance that they are manufacturing in the cultivation site.   In my training and experience, I believe this is also indicative of the trafficking organization dropping off supplies and other items to sustain the workers located at the cultivation site.

24

### C.    The SUBJECT PREMISE 1

51.    During the surveillance efforts in 2019 and 2020, investigators saw all of the 2019 TARGET VEHICLES with the exception of the Target F-150, and the 2020 TARGET VEHICLES at the SUBJECT PREMISE 1.  The 2019 TARGET VEHICLES and 2020 TARGET VEHICLES have been parked in front of SUBJECT PREMISE 1, parked in the driveway of SUBJECT PREMISE 1, and/or remained overnight at SUBJECT PREMISE 1.  Based on my training and experience, I believe that SUBJECT PREMISE 1 is used as a central meeting point or stash house for individuals involved in the marijuana cultivation operation.

52.    According to California DMV records for SANCHEZ-MARTINEZ that I checked on August 6, 2020, the SUBJECT PREMISE 1 is his address of record.  Additionally, law enforcement has seen SANCHEZ-MARTINEZ at the SUBJECT PREMISE 1.  For example, on May 12, 2020, at approximately 4:49 p.m., while conducting surveillance efforts near the SUBJECT PREMISE 1, I witnessed SANCHEZ-MARTINEZ reverse the Target Dodge 52684S2 out of the driveway, exit it, close the driveway entrance gate, and reenter it, and then drive away from the SUBJECT PREMISE 1.  I saw this from approximately 50 yards away from SANCHEZ-MARTINEZ's location.  There was no one with SANCHEZ-MARTINEZ.  He then drove the Target Dodge 52684S2 directly to a private property in Temecula, California, and then returned to SUBJECT PREMISE 1 afterwards.  The tracking device on the Target Dodge 52684S2 logged this travel.

1. **Recent Surveillance at the SUBJECT PREMISE 1**

53. On July 27, 2020, while conducting surveillance, LEO Ochoa and I saw what we believed to be one of the 2020 TARGET VEHICLES (the Target Toyota 48909X2) as well as the Toyota 4-Runner 6GDW741 (which, as described above, has been identified as being involved in cultivation activity based on its frequent travels to the cultivation site) parked in the driveway of SUBJECT PREMISE 1.

54. On July 31, 2020, while conducting surveillance, LEO Ochoa and I again saw what we believed to be the Toyota 4-Runner 6GDW741 parked in the driveway of SUBJECT PREMISE 1.

**D.** **The SUBJECT PREMISE 2**

55. On June 12, 2020, the Target Dodge 52684S2, which is the vehicle that appears to be used most frequently by SANCHEZ-MARTINEZ for activities related to the cultivation site and other travel, drove to the SUBJECT PREMISE 2. Since then, the Target Dodge 52684S2 has spent most days at and stayed overnight at the SUBJECT PREMISE 2. The tracking device on the vehicle does show, however, periodic travel to and from SUBJECT PREMISE 1.

56. On June 18, 2020 at approximately 4:06 p.m., LEO Nelles and I followed the Target Dodge 52684S2 to 3150 Case Road, Perris, California 92570, which is a WinCo Foods grocery store. I walked into the store and saw SANCHEZ-MARTINEZ gathering grocery items and placing them into a shopping cart. LEO Nelles and I then remained in the area and waited for SANCHEZ-MARTINEZ to return to his car. SANCHEZ-MARTINEZ and

another unidentified male returned with two full shopping carts and proceeded to unload the large amount of groceries into the rear passenger seat of the Target Dodge 52684S2.

57. SANCHEZ-MARTINEZ drove the car with the unidentified male in the passenger seat. They left the WinCo Foods and drove to the SUBJECT PREMISE 2. The Target Dodge 52684S2 then drove to other markets/commercial businesses/private properties before driving to the highway drop point along Ortega Highway at the Cleveland National Forest grow site. The Target Dodge 5268S2 arrived at the cultivation site at approximately 8:24 p.m., and then again at approximately 9:11 p.m. The photographs captured by the trail and highway drop point cameras from those times show subjects walking to and from the cultivation site on the identified trail and to and from the highway drop point. The photographs depict clearly subjects walking out of the cultivation site without supplies/things they brought in, and then return to the cultivation site carrying boxes and bags.

58. The next morning, on June 19, 2020, at around 6:32 a.m., the trail and highway drop point cameras captured the Target Dodge 52684S2 pull into the highway drop point turnout. After that, the tracking device on the Target Dodge 52684S2 tracked it to the SUBJECT PREMISE 2.

59. Based on my training and experience, I believe that SANCHEZ-MARTINEZ is using the SUBJECT PREMISE 2 as a base to store supplies used to resupply the grow site and potentially also a location to house workers who are then transported to the grow site to assist with the cultivation effort.

60.  On July 24, 2020, at approximately 3:30 p.m., USFS Special Agent Jennifer Taylor and I saw the Target Dodge 52684S2 parked in front of a commercial business located at 33983 Mission Trail Suite B, Wildomar, California, 92595.  At approximately 3:55 p.m., we saw SANCHEZ MARTINEZ exit the commercial business (Multiservicio Latino) alone and enter the Target Dodge 52684S2.  We followed the Target Dodge 52684S2 to SUBJECT PREMISE 2, where it came to a stop.  As Agent Taylor and I drove by SUBJECT PREMISE 2, I saw the Target Dodge 52684S2 parked in front of the property, along Pico Road (which is the address in the definition of the SUBJECT PREMISE 2), and I saw a male subject walking from the front residence toward the Target Dodge 52684S2.

61.  On August 6, 2020, at approximately 3:00 p.m., LEO Ochoa and I saw the Target Dodge 52684S2 parked on the driveway of the SUBJECT PREMISE 2.

62.  On June 26, 2020, LEO Nelles and I drove by the SUBJECT PREMISE 2.  When we arrived, the Target Dodge 52684S2 was parked in the driveway at a residence with an address on Long Street.  The residence is directly behind the SUBJECT PREMISE 2 on the same parcel of land.

63.  Said another way, the parcel of land that is SUBJECT PREMISE has two structures on it.  One with an address that is in the definition of SUBJECT PREMISE 2 and the other with the address of "28405 LONGS."  The "28405 LONGS" residence appears to be a modular/mobile/manufactured home that had been recently placed there.  There is a wooden large sign attached to the

fence located directly in front of the residence, parallel to Long Street, which says, "28405 LONGS."

64. The structures on the SUBJECT PREMISE 2 (when considering the structure with the address in the definition (Pico Road) and the structure with the Long address) have no fences or barriers between them on the parcel. I have seen the Target Dodge 52684S2 parked in the front, in the back, and on the side of the structure off Pico Street, and I have seen it parked in the front, in the back and on the side of rear structure off Long Street. The tracking device on the Target Dodge 52684S2 confirms my observations. The two structures also appear to share the same common area (essentially a backyard) that is located in between the rear of the front structure and the side of the rear structure.

65. Subjects are continuing to use the SUBJECT PREMISE 2 as they begin the harvesting process of the marijuana product. On July 27, 2020, which was the second documented instance of subjects carrying bags out of the Cleveland National Forest cultivation site, the subjects carrying bags suspected to contain harvested marijuana product from the grow site arrived at the highway drop point while Target Dodge 52684S2 was present at that location. When the Target Dodge 52684S2 left, the subjects were photographed by the surveillance cameras returning along the trail to the cultivation site without the large bags but with additional items. The tracking device on the Target Dodge 52684S2 recorded that it traveled to the cultivation site from the SUBJECT PREMISE 2 and returned to the SUBJECT PREMISE 2

after departing the highway drop point.  Based on my training
and experience, this indicates to me that the SUBJECT PREMISE 2
is being used to store supplies used to resupply workers at the
cultivation site as they work to harvest the marijuana product,
and also that the SUBJECT PREMISE 2 is likely being used to
store and process the harvested marijuana product.

## VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

66.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, _inter alia_, is
often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are

_____

[4] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

67. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

68. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

c.    As set forth above, the SUBJECT PREMISES used by
multiple members of an organization to possibly store drugs and
guns.  I know, based on my training and experience, that, in
order to protect valuable drugs and drug proceeds, drug
traffickers do not permit those who are not involved in the
organizations drug business to be at the house.  In my training
and experience, digital devices found in stash houses like the
SUBJECT PREMISES may not have a clearly identifiable user based

33

on the exterior of the device and/or may have multiple users whose biometric features may unlock the devices because drug traffickers share digital devices on which to coordinate drug trafficking and the laundering of drug trafficking proceeds. Thus, if while executing the warrant, law enforcement personnel encounter a digital device within the scope of the warrant that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the SUBJECT PREMISES during the execution of the search: (1) depress the person's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

69. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

## VII. <u>CONCLUSION</u>

70. For all the reasons described above, there is probable cause to believe that SANCHEZ-MARTINEZ and others have committed violations of the SUBJECT OFFENSES, and that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of the SUBJECT OFFENSES, will be found at the SUBJECT PREMISE 1 and the SUBJECT PREMISE 2 (as described in Attachments A-1 and A-2, respectively).

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 7th day of August, 2020.

_____
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-2

The premises to be searched is described with the valid address of 23775 Pico Road, Nuevo, California 92567 ("SUBJECT PREMISE 2"). The SUBJECT PREMISE 2 has Riverside County Parcel Number 309-360-00323755 associated with it.  The premise is a rural parcel of land approximately 1.05 acres in size located in Riverside County, California, specifically in the town of Nuevo, with two mobile/manufactured structures on it.  The SUBJECT PREMISE 2 includes both residential structures on the parcel as well as locked locations on the premises, outbuildings, and vehicles on or adjacent to the premises.

The first structure is identified with the address 23775 Pico Road, Nuevo, California 92567, which is a valid address.

The second structure is located in the back of the parcel, along Long Street.  This structure has a large spray painted wooden sign resting against the fence that says, "28405 LONGS." Land records do not list a 28405 Long Street, Nuevo, California 92567 as a valid address.

///

///

i

The following aerial view of parcel pre-dates the second added structure in the back of the parcel.



///
///

The following is a photograph of the first structure, on the front of the property, with address 23775 Pico Road, Nuevo, California 92567.



///
///

Case 5:20-mj-00409-DUTY *SEALED* Document 3-1 *SEALED* Filed 09/07/20 Page 40 of 50 Page ID #:130

The following is a photograph of the second structure at the back of the parcel, with large spray painted wooden sign resting against the fence that reads, "28405 LONGS."



<u>**ATTACHMENT B**</u>

I.  <u>**Property to be Seized**</u>

1.    The items to be seized are fruits, evidence, contraband, or instrumentalities, in whatever form and however stored, of violations of 21 U.S.C. §§ 841 (possession with intent to distribute controlled substances and distribution of controlled substances) and 846 (conspiracy to possess with intent to distribute controlled substances and to distribute controlled substances ) (the "SUBJECT OFFENSES"), namely:

a.    Controlled substances, including marijuana, and any other illegal controlled substances, as well as any materials or items used for the preparation for transporting, packaging, sale, storing, or distributing of illegal controlled substances.

b.    Books, records, receipts, notes, ledgers, and other papers including any computerized or electronic records, concerning the transportation, packaging, sale, storage, ordering, purchasing, or distribution of controlled substances.

c.    Books, records, receipts, notes, ledgers, and other papers including any computerized or electronic records, concerning the cultivation sites at Cleveland National Forest, Riverside County along State Route 74/Ortega Highway, and San Bernardino National Forest, San Bernardino County along Cleghorn Road.

d.    Address and/or phone books, papers, paging devices and their contents, and cell phones and their contents

reflecting names, addresses and/or phone numbers, including computerized or electronic address and/or phone records.

     e.   Books, records, receipts, bank statements and record money drafts, letters of credit, money orders and cashier's checks, receipts, passbooks, bank checks, safety deposit keys, and any other items evidencing the obtaining, hiding, transfer, and/or concealment of assets and/or expending or money from January 2019 to the present.

     f.   Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed.

     g.   Audio recordings, pictures, video recordings, or still captured images concerning the purchase, sale, transportation, or distribution of drugs.

     h.   Contents of any calendar or date book between January 1, 2019 and the present.

     i.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations between January 1, 2019 and the present.

     j.   United States currency, precious metals, jewelry and financial instruments, including stocks and bonds.

k.   Photographs, in particular, photographs of co-conspirators, of assets, and/or of controlled substances, and other documents identifying associates and co-conspirators.

l.   Indicia of occupancy, residence, and/or ownership of the SUBJECT PREMISE 1 and SUBJECT PREMISE 2, including utility and phone bills, canceled envelopes and keys, limited to 20 items per location to be searched.

m.   Indicia of travel, including passport, visas, airline tickets, boarding passes, and airline receipts from January 2019 to the present.

n.   Weapons, handguns, and ammunition, as well as items pertaining to the possession of firearms, including gun cases, ammunition magazines, holsters, spare parts for firearms, firearms cleaning equipment, photographs of firearms or persons in possession of firearms, and receipts for the purchase and/or repair of all these items.

o.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

p.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v.  evidence of the times the device was used;

        vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

5.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or

seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

6.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

7.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

8.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

9.   The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

10.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of

a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

11. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

12. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

13. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

14. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully

search a device because the device or files contained therein is/are encrypted.

15. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

16. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

17. In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

     a. Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

     b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

     c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

18.    During the execution of this search warrant, with respect to any person who is located at the SUBJECT PREMISE 1 and the SUBJECT PREMISE 2 during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant, law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of the person onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as

defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

19. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.